ORAL ARGUMENT NOT YET SCHEDULED

**Case No. 16-1031**

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

Natalie Ruisi and Michael Peluso,
                                        *Petitioners*,

*v*.

National Labor Relations Board,
                                        *Respondent*.

———————

**On Petition for Review of a Decision
and Order of the National Labor Relations Board**

———————

**BRIEF OF PETITIONERS**

———————

Aaron B. Solem
Glenn M. Taubman
Alyssa K. Hazelwood
c/o National Right to Work Legal
  Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
(703) 321-8510
abs@nrtw.org
gmt@nrtw.org
akh@nrtw.org
*Attorneys for Petitioners*

June 16, 2016

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioners Natalie Ruisi and Michael Peluso certify the following:

**(A)**   ***Parties and Amici***:

(1)    The National Labor Relations Board ("NLRB" or "Board") is the Respondent in the case before this Court;

(2)    Natalie Ruisi and Michael Peluso were the Charging Parties before the Board, and are the Petitioners in this Court;

(3)    Local Joint Executive Board of Las Vegas, Culinary Workers Union, Local 226, and Bartenders Union, Local 165, affiliated with UNITE HERE, was the Respondent in the Board proceedings.

**(B)**   ***Rulings Under Review***: This case is before the Court on petition for review of the Board's Decision and Order in *Local Joint Executive Board of Las Vegas, Culinary Workers Union, Local 226, and Bartenders Union, Local 165, affiliated with UNITE HERE (Host International, Inc.)*, Case Nos. 28-CB-128997 and 28-CB-129003, *reported at* 363 NLRB No. 33 (Oct. 30, 2015).

**(C)**   ***Related Cases***: Counsel is unaware of any related cases currently pending at this time.

Respectfully submitted,

/s/Aaron B. Solem
Aaron B. Solem

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY OF ABBREVIATIONS ................................................. viii

APPELLATE JURISDICTION ............................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................1

STATEMENT OF THE CASE.............................................................2

STATEMENT OF THE FACTS ..........................................................3

STANDING .......................................................................................7

SUMMARY OF ARGUMENT ............................................................8

STANDARD OF REVIEW ...............................................................12

ARGUMENT ...................................................................................13

I.   THE DUTY OF FAIR REPRESENTATION REQUIRES THE UNION TO PROVIDE
     EMPLOYEES WITH INFORMATION NECESSARY TO REVOKE CHECKOFFS. .........13

     A.   Courts and the NLRB have traditionally struck down union imposed
          procedural hurdles that frustrate an employee's attempt to revoke a
          checkoff. ...............................................................................13

     B.   The Union's duty of fair representation. .................................17

     C.   The Union's refusal to provide represented employees with anniversary
          or window period dates over the telephone was arbitrary. ......................19

     D.   The Union's refusal to provide time-sensitive information was in bad
          faith.......................................................................................24

     E.   The Union's refusal to provide the requested information was
          discriminatory.......................................................................25

i

II.  THE BOARD'S DECISION CONTAINS NO REASONING AND LACKS CITATION TO
     ANY RELEVANT AUTHORITY. ..........................................................................27

CONCLUSION.......................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Commc'ns Workers of Am.*,
  59 F.3d 1373 (D.C. Cir. 1995)....................................................17

*Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*,
  403 U.S. 274 (1971)............................................................26

*Am. Baptist Homes*,
  364 NLRB No. 13 (2016) ....................................................22

*Anheuser-Busch, Inc. v. Int'l Bhd. of Teamsters, Local 822*,
  584 F.2d 41 (4th Cir. 1978) ...............................................13

*Auto Workers Local 909 (Gen. Motors Corp.-Powertrain)*,
  325 NLRB 859 (1998) ........................................................20

*\*Boston Gas Co.*,
  130 NLRB 1230 (1961) ................................................ 28, 31

*Branch 529, Nat'l Ass'n of Letter Carriers*,
  319 NLRB 879 (1995) .................................................. 19, 20

*Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*,
  493 U.S. 67 (1989)...................................................... 17, 27

*\*Cal. Saw & Knife Works*,
  320 NLRB 224 (1995) ............................................. 14, 21, 27

*Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*,
  494 U.S. 558 (1990).........................................................18

*Chicago Tribune Co. v. NLRB*,
  79 F.3d 604 (7th Cir. 1996) ...............................................22

*Chicago Tribune Co. v. NLRB*,
  965 F.2d 244 (7th Cir. 1992) .............................................22

iii

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*DHL Express, Inc. v. NLRB*,
  813 F.3d 365 (D.C. Cir. 2016)................................................................ 12, 17, 28

*Elec. Workers Local 66 (Houston Lighting & Power Co.)*,
  262 NLRB 483 (1982) ...................................................................................15

*Excelsior Underwear Inc.*,
  156 NLRB 1236 (1966) .................................................................................22

*Felter v. S. Pac. Co.*,
  359 U.S. 326 (1959)................................................................ 13, 14, 15, 25, 31

*Hughes Aircraft Co.*,
  164 NLRB 76 (1967) ....................................................................................20

*Int'l Alliance of Theatrical Stage Emps. (Tropicana Las Vegas, Inc.)*,
  363 NLRB No. 148 (2016) ...........................................................................22

*Int'l Bhd. of Boilermakers, Local Union No. 154*,
  253 NLRB 747 (1980) ..................................................................................20

*Int'l Bhd. of Teamsters, Local No. 310 v. NLRB*,
  587 F.2d 1176 (D.C. Cir. 1978)....................................................................17

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. NLRB*,
  865 F.2d 791 (6th Cir. 1989) .......................................................................26

*Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers v. NLRB*,
  41 F.3d 1532 (D.C. Cir. 1994)......................................................................24

*Int'l Union of Elec., Radio & Mach. Workers, Local 801 v. NLRB*,
  307 F.2d 679 (D.C. Cir. 1962)......................................................................18

*Law Enf't & Sec. Officers, Local 40B (S. Jersey Detective Agency)*,
  260 NLRB 419 (1982) ..................................................................................20

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Local 282, Int'l Bhd. of Teamsters (Gen. Contractors)*,
    280 NLRB 733 (1986) ........................................................20

*Long Island Head Start Child Dev. Servs. v. NLRB*,
    460 F.3d 254 (2d Cir. 2006) ........................................ 28, 32

*Machinists Local Lodge 2777 (L-3 Commc'ns)*,
    355 NLRB 1062 (2010) ...................................................27

*Mail Handlers Local 307 (Postal Service)*,
    339 NLRB 93 (2003) ........................................................28

*Manorcare of Kingston v. NLRB*,
    ___ F.3d ___, No. 14-1166 (D.C. Cir. May 20, 2016) .................................. 12, 28

*Marquez v. Screen Actors Guild, Inc.*,
    525 U.S. 33 (1998) ........................................................ 17, 24

*Mock v. T.G. & Y. Stores Co.*,
    971 F.2d 522 (10th Cir. 1992) ..........................................24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................12

*NLRB v. Local 282 Int'l Bhd. of Teamsters*,
    740 F.2d 141 (2d Cir. 1984) ......................................... 18, 19

*Oil, Chem. & Atomic Workers Local Union No. 6-418 v. NLRB*,
    694 F.2d 1289 (D.C. Cir. 1982)........................................7

*Operating Eng'rs (Mich. Chapter, Assoc'd Gen. Contractors of Am., Inc.)*,
    226 NLRB 587 (1976) .................................................. 21, 22

*Pattern Makers' League of N. Am. v. NLRB*,
    473 U.S. 95 (1985)..................................................... 14, 15

*Peninsula Shipbuilders' Ass'n v. NLRB*,
    663 F.2d 488 (4th Cir. 1981) ..................................... 13, 14, 25

## TABLE OF AUTHORITIES (CONT'D)

<u>Page(s)</u>

*Perdue Farms, Inc., Cookin' Good Div. v. NLRB*,
  144 F.3d 830 (D.C. Cir. 1998)...............................................................12

*Plumbers & Pipefitters Local Union No. 32 v. NLRB*,
  50 F.3d 29 (D.C. Cir. 1995)...................................................................19

*Point Park Univ. v. NLRB*,
  457 F.3d 42 (D.C. Cir. 2006).................................................................12

*\*Postal Serv.*
  302 NLRB 701 (1991) ..........................................................28, 29, 30

*Radio Officers Union v. NLRB*,
  347 U.S. 17 (1954)................................................................................15

*Robesky v. Qantas Empire Airways, Ltd.*,
  573 F.2d 1082 (9th Cir. 1978) ...............................................................19

*Sec. Pers. of Hosps. (Church Charity Found. of Long Island, Inc.)*,
  267 NLRB 974 (1983) ...........................................................................20

*Shea v. Int'l Ass'n of Machinists & Aerospace Workers*,
  154 F.3d 508 (5th Cir. 1998) .................................................................25

*Sheet Metal Workers Local 170*,
  225 NLRB 1178 (1976) ..........................................................................14

*Smith's Food & Drug Ctrs, Inc. (d.b.a. Fry's Food Stores)*,
  362 NLRB No. 36 (2015) .......................................................................13

*Steele v. Louisville & Nashville R.R.*,
  323 U.S. 192 (1944).......................................................................17, 18

*Vaca v. Sipes*,
  386 U.S. 171 (1967).......................................................................17, 18

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

**Statutes**

29 U.S.C. § 157 ...........................................................................1, 8

29 U.S.C. § 159(a) ...........................................................................17

29 U.S.C. § 160(f) ..........................................................................1, 7

29 U.S.C. § 164(b) ...........................................................................8

29 U.S.C. § 186(c)(4) ........................................................................9

**Regulations**

Representation – Case Procedures,
   79 Fed. Reg. 74308, 74335-61 (Dec. 15, 2014) ..................................22

\*   Authorities upon which we primarily rely are denoted by asterisks

## GLOSSARY OF ABBREVIATIONS

Administrative Law Judge                    ("ALJ")

Checkoff authorization                      ("checkoff")

Joint Appendix                              ("JA")

National Labor Relations Act                ("NLRA" or "Act")

National Labor Relations Board              ("NLRB" or "Board")

Unfair labor practice                       ("ULP")

Local Joint Executive Board of Las Vegas,
Culinary Workers Union, Local 226, and
Bartenders Union, Local 165                 ("Union")

## APPELLATE JURISDICTION

The Court has jurisdiction over this case pursuant to Section 10(f) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 160(f). On October 30, 2015, the National Labor Relations Board ("NLRB" or "Board") issued a final and judicially reviewable decision. The Board found Local Joint Executive Board of Las Vegas, Culinary Workers Union, Local 226, and Bartenders Union, Local 165 ("Union") committed an unfair labor practice ("ULP") by refusing to honor Petitioner Michael Peluso's ("Peluso") membership resignation and checkoff authorization ("checkoff") revocation, but dismissed the remainder of Peluso and Petitioner Natalie Ruisi's ("Ruisi") ULP charges. *Local Joint Exec. Bd. of Las Vegas, Culinary Workers Union, Local 266, & Bartenders Union, Local 165*, 363 NLRB No. 33 (2015), JA 403-08. Specifically, the Board upheld the Union's practice of refusing to divulge, over the telephone, employees' checkoff anniversary dates or fifteen-day checkoff revocation "window period" dates. Because the Union requires revocation during very short 'window periods," this information is time-sensitive and critically important to employees wishing to exercise their right to refrain under Section 7 of the Act. *See* 29 U.S.C. § 157.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

(1) Whether the NLRB erred in holding the Respondent Union did not violate its duty of fair representation when it declined to provide Ruisi and Peluso,

over the telephone, with the anniversary dates of when they signed their checkoffs, or their fifteen-day window period dates to revoke their checkoff.

(2) Whether the NLRB's decision is adequately reasoned, and legally and factually justified, given its failure to cite any relevant case law and ignoring several critical facts.

## STATEMENT OF THE CASE

On May 16, 2014, Ruisi and Peluso filed ULP charges alleging that the Union failed and refused to provide them with the dates of their respective annual fifteen-day window periods during which they could revoke their checkoffs and refrain from further financial support of the Union. That time-sensitive information was critically important for the Petitioners' exercise of their Section 7 right to refrain, because the Union creates and strictly enforces very short window periods.

The General Counsel issued a Complaint based on those ULP charges and, on March 17, 2015, Administrative Law Judge Joel P. Biblowitz ("ALJ") found that the Union violated Section 8(b)(1)(A) of the Act, 29 U.S.C. § 158(b)(1)(A), by refusing to accept Peluso's timely resignation and revocation letter. However, the ALJ found that the Union did not violate the Act when it refused to respond to telephone inquiries and provide Peluso and Ruisi with the dates of their fifteen-day window periods for revoking their checkoffs, and dismissed this claim.

Petitioners filed timely exceptions to the ALJ's decision to dismiss that portion of their claims. On October 30, 2015, the Board affirmed the ALJ's ruling with little additional comment. In so doing, the Board agreed with the ALJ's reasoning that the Union's refusal to provide time-sensitive information over the telephone was not "so far outside 'a wide range of reasonableness' as to be irrational." *Local Joint Exec. Bd.*, 363 NLRB No. 33, n.1, JA 403.

## STATEMENT OF THE FACTS

Long ago, Peluso and Ruisi signed individual checkoffs authorizing their employers to deduct union dues from their paychecks and remit the dues to the Union.[1] The checkoff contained a fifteen-day window period to revoke. Consistent with common union practice, the checkoff's window period was written in confusing language, with additional procedural hurdles, to make revocation as difficult as legally possible. The checkoffs stated:

> This authorization shall remain in effect and shall be irrevocable unless I revoke it by sending written notice to both the Employer and the Union by registered mail during a period of fifteen (15) days immediately succeeding any yearly period subsequent to the date of this authorization or subsequent to the date of termination of the applicable contract between the Employer and the Union, whichever occurs sooner, and shall be automatically renewed as an irrevocable checkoff from year to year unless revoked as hereinabove provided, irrespective of whether I am a Union member.

---

[1] Ruisi signed her checkoff card in 2004 and Peluso signed his checkoff card in 2007. JA 276, 282.

3

JA 276, 282.

On November 25, 2013, Ruisi called the Union on behalf of herself and Peluso to inquire about resigning membership in the Union and revoking checkoffs.[2] JA 84. Her call was directed to the official in charge of membership concerns, Director of Operations Wanda Henry ("Henry").[3] JA 84, 145. Henry told Ruisi in order to revoke a checkoff an employee had to send a letter during his or her fifteen-day window period. Ruisi then inquired when that window period occurred for her and Peluso.  JA 85. Henry refused to tell Ruisi the window period dates. Instead, Henry told Ruisi to contact her employer's payroll department to obtain that information. JA 85-87.

On December 9, 2013, as instructed, Ruisi called her employer's payroll department to ask for the date of her and Peluso's window periods. JA 87-89. The payroll representative noted the only dates she had on file were the dates when the employer began deducting union dues from their paychecks, which was August 16, 2004 for Ruisi and March 8, 2007 for Peluso. JA 87-89. This information was immaterial, however, because a window period begins on the day the checkoff is signed, not the day dues begin to be deducted.

---

[2] At the time, Ruisi was engaged to Peluso. They are now married.
[3] Henry has worked for the Union since 1989, and has served as the Director of Operations since 1998. JA 38-39. Henry was very familiar with the fifteen-day window period and dealt with it on a daily basis, handling three or four phone calls per day. JA 44.

Based on that information, Peluso sent his resignation and revocation letter to the Union on February 20, 2015. JA 89. Unbeknownst to Ruisi and Peluso, Peluso's window period was February 5-20. Thus, the letter was sent on the last day of his window period. To ensure his resignation letter had been received, Peluso promptly called and left messages for Henry on February 24, one of which gave Henry permission to speak with Ruisi about his situation. JA 91.

On February 25 Henry returned Peluso's phone call and spoke to Ruisi regarding Peluso's checkoff revocation. JA 90-91. Henry notified Ruisi that Peluso's revocation had been denied because he had missed his window period. JA 91-92. Ruisi sought clarification, as her employer had told her the relevant date for Peluso to revoke was March 8. Henry stated: "That's not his date. I looked it up. His date is February 4th and he missed the cutoff date." JA 92. Ruisi asked why Henry had directed her to ask the employer's payroll department for the window period dates if Henry had ready access to this critical information. Henry responded: "I don't look it up, not until you send a letter." JA 92. Ruisi then asked Henry for her own anniversary date.  JA 93. Henry refused to give it to her and again referred her to the employer's payroll department. JA 93.

Although Henry did not recall the content of her conversation with Ruisi, JA 64-65, she testified that she normally tells those employees seeking to resign or revoke their checkoffs that they must send a letter stating their intent during their

5

fifteen-day window period. JA 146-47. As a matter of "policy," Henry refuses to give employees their anniversary dates or window period dates over the telephone. JA 146-49.

The Union's "policy" is unwritten and not communicated to employees until they attempt to revoke. Until the hearing in this case, the Union had never offered any explanation for its policy. At this hearing, the Union offered several shifting and inconsistent justifications for its policy. First, Henry voiced security concerns, stating "I have to verify confidential information. I need to verify who it is. And if somebody wants to stop their dues, I have to receive it in writing." JA 147. Second, Henry stated that the written request was:

> a document that I can put with everything else that I put together. If I'm stopping someone's dues, I need to have the documents together. If I'm telling someone they're not in their window period, then I'm going to be sending them back a copy of a dues card with their name, social, and everything on it. So I want to make sure that I'm sending—dealing with the proper person. I don't want to stop someone's dues that is not requesting it.

JA 147; *see also* JA 149, 179. Henry also claimed, incorrectly, the checkoff card and the collective bargaining agreement required her to receive a request for dates in writing. JA 149. Finally, Henry cited that she was also busy with other duties, and a written request would allow her to get to it "as quickly as [she] can." JA 47-48.

Henry admitted, however, she was willing to tell an employee his "initiation date," the date the employee became a member of the Union, over the telephone, because "it had no bearing" and thus did not constitute personal information. JA 45-47.[4] Henry also admitted it would take her less than two minutes to look up an employee's window period dates on her computer. JA 53-54. And, of course, Henry gave Peluso's checkoff revocation date to Ruisi during their February 25 telephone conversation. JA 92. Henry, however, only disclosed the dates over the phone after she thought Peluso's window period had passed.

## STANDING

Ruisi and Peluso are aggrieved persons under 29 U.S.C. § 160(f). As Charging Parties below they were denied their requested relief under the Board's dismissal order. *See Oil, Chem. & Atomic Workers Local Union No. 6-418 v. NLRB*, 694 F.2d 1289, 1294 (D.C. Cir. 1982) ("As long as a charging party gets less than he requested, he is treated as a person aggrieved under section 10(f)." (internal quotations omitted)). Although the Board did find that the Union engaged

---

[4] Henry further testified:

> I have no rules against giving that initiation date to a worker. I'm not giving out any personal information. The date on the dues card is specific to that worker that is going to stop their dues. If I stop somebody's dues – and I don't know who you are when you call me. And that person lose [sic] rights when I stop someone's dues. So giving that information out is confidential and I only give it out when it's done through a letter.

JA 47.

in a ULP by failing to accept Peluso's timely resignation letter, it dismissed the remainder of the ULP charges concerning the Union's unwritten "policy" of requiring a *written* request before providing employees with their window period information and refusing to provide this information over the telephone. Thus, both Peluso and Ruisi are aggrieved persons because the Board's Final Order denied in part the relief they sought.

## SUMMARY OF ARGUMENT

This case reveals the multiple, illegitimate hurdles unions have erected, with the imprimatur of the NLRB, to prevent employees from exercising their rights to leave the union and stop paying dues. Section 7 of the NLRA, 29 U.S.C. § 157, gives employees a right to refrain from assisting a union. Section 14(b) of the NLRA, 29 U.S.C. § 164(b), allows states to enact Right to Work laws preventing employers and unions from requiring the payment of dues or fees as a condition of employment. Ruisi and Peluso are employed in Nevada, and under its Right to Work law, cannot be required to pay dues. Unions have developed various "workarounds" to prevent the cessation of dues deductions in Right to Work states, such as requiring employees who wish to revoke their checkoffs to comply with very short "window periods." Generally, those window periods are fifteen-days long and their existence is buried in confusing checkoffs laden with "legalese." Employees wishing to revoke their checkoffs are required to send a letter during

this annual fifteen-day window period only; and if an employee misses the date by one day, his or her legal rights to stop paying dues are lost for another full calendar year.

Here, the Union requires employees seeking to end dues deductions to send the Union a letter during an annual fifteen-day window period. The window period is keyed to the anniversary of the date an employee signed his or her checkoff. While a period of irrevocability is a procedural hoop arguably countenanced by Section 302(c)(4) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(4), this case concerns a concealed hurdle the Union has devised to make it even more difficult for employees to exercise their right to leave the Union and stop paying dues. Here, the Union maintains an unwritten "policy" that employees may only request their window period dates in writing.[5] When Ruisi called the Union to find out her and her husband's window period dates, the Union official declined to give her that readily accessible and critical time-sensitive information over the telephone. The Union official who maintains the window period dates also misdirected Ruisi and Peluso to the employer's payroll department, which did not possess the information. Of course, the Union's fifteen-day window period was

---

[5] It is certainly odd that a union maintains an *unwritten* "policy" requiring *written* requests for date information.

9

freely given over the telephone by the Union, but only after the Union official thought the window period had passed.

In essence, the Union's unwritten policy requires employees who seek to stop their dues deductions to send *two* different letters—the first asking when their window period occurs, and the *second*, which must be sent during the fifteen-day window period, to actually revoke their checkoffs. This policy is arbitrary and deliberately discriminates against employees who wish to leave the Union and cease paying dues, by making it as hard as possible for them to do so.

The ALJ dismissed Ruisi and Peluso's claims that the Union violated its duty of fair representation by refusing to provide the time-sensitive information, even though he cited no union interests to support the Union's unwritten policy. The Board, in turn, issued a cursory affirmance via a footnote, citing two inapposite cases. This decision must be overturned for two main reasons.

*First*, the Union violated its duty of fair representation because its actions were arbitrary, in bad faith, and discriminatory. The Union cannot refuse to provide employees with easily accessible, time-sensitive information, over the telephone that is necessary to comply with the Union's self-imposed revocation procedure. The Union had immediate access to Ruisi and Peluso's window period dates—the Union admitted it took less than two minutes to look them up—and it failed to show any legitimate union interest for denying their oral request. Instead,

10

the Union and NLRB are elevating the Union's pecuniary interests over those of employees who wish to exercise their rights. Simply put, the Union easily could have given Ruisi and Peluso their window period dates over the telephone, without the need for a written letter, but it declined to do so in order to frustrate their revocation attempts and to continue collecting their money for another year.

*Second*, the Board's opinion is bereft of analysis of the facts and factors underlining the duty of fair representation. In three sentences, the Board deigns the Union's unwritten policy of refusing to give out window period dates over the telephone as "rational." The Board, however, ignores critical facts: the checkoff anniversary and window period dates are not private information; the Union had easy access to the dates; and the Union, in fact, provided Peluso's date to Ruisi over the telephone, but only after it believed he had already missed the window period and thus was stuck for another year. The Board ignores both the Union's fiduciary duty towards these employees and its countervailing pecuniary interest in seizing their money for as long as possible.

In a footnote, the Board's opinion cites two cases for support, but neither stands for the proposition that a union may lawfully refuse to provide readily accessible and time-sensitive information to represented employees unless they make a request in writing. The Board's conclusion, without analysis or explanation, requires the Court to grant the Petition.

11

## STANDARD OF REVIEW

It is well settled no deference is warranted where the Board "fails to adequately explain its reasoning, where the Board leaves critical gaps in its reasoning, or where the Board erred in applying law to facts." *DHL Express, Inc. v. NLRB*, 813 F.3d 365, 371 (D.C. Cir. 2016) (quotations omitted) (citing *Point Park Univ. v. NLRB*, 457 F.3d 42, 49-50 (D.C. Cir. 2006); *Perdue Farms, Inc., Cookin' Good Div. v. NLRB*, 144 F.3d 830, 834 (D.C. Cir. 1998)); *see also Manorcare of Kingston v. NLRB*, ___ F.3d ___ No. 14-1166, at *13 (D.C. Cir. May 20, 2016) (refusing to enforce Board order that "depart[ed] from precedent without a reasoned analysis") (citations omitted); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48-49 (1983) (agency will not be afforded deference unless it has considered all relevant issues and factors). Here, the Board rubber-stamped the ALJ with no analysis, cited two inapposite cases, failed to explain its reasoning, and ignored critical facts. Therefore, deference is not warranted.

## ARGUMENT

I. **THE DUTY OF FAIR REPRESENTATION REQUIRES THE UNION TO PROVIDE EMPLOYEES WITH INFORMATION NECESSARY TO REVOKE CHECKOFFS.**

    A. **Courts and the NLRB have traditionally struck down union imposed procedural hurdles that frustrate an employee's attempt to revoke a checkoff.**

Unions generally make checkoff language confusing and ambiguous to create traps for the unwary and lock employees into paying dues when they no longer wish to do so. *See, e.g.*, *Smith's Food & Drug Ctrs., Inc. (d.b.a. Fry's Food Stores)*, 362 NLRB No. 36 (2015), *appeal pending*, D.C. Cir. No. 15-1102 (filed Apr. 17, 2015) (union denies hundreds of checkoff revocations during a contract hiatus because they fall outside of various fifteen-day window periods); *Felter v. S. Pac. Co.*, 359 U.S. 326, 329-30 (1959) (union requirement that employees utilize only one union-prescribed form to revoke their checkoffs held invalid); *Anheuser-Busch, Inc. v. Int'l Bhd. of Teamsters, Local 822*, 584 F.2d 41, 43 (4th Cir. 1978) (union violated the law by refusing employees checkoff revocations during contract hiatus); *Peninsula Shipbuilders' Ass'n v. NLRB*, 663 F.2d 488, 489 (4th Cir. 1981) (union violated NLRA when it denied checkoff revocations not submitted on union-supplied forms).

Courts have long held unions cannot impose procedural requirements that make checkoff revocation burdensome. For example, in *Felter*, the Supreme Court applied the Railway Labor Act to hold that a union cannot require revocations to

be only on a union-supplied form. 359 U.S. at 329-30. In *Peninsula Shipbuilders*, the Fourth Circuit held that a provision requiring employees to use special forms and revoke in-person inhibited employees' statutory rights under the NLRA. 663 F.2d at 492-93. These cases reflect a judicial understanding that unions cannot unilaterally impose hoops, hassles, and burdens on employees seeking to exercise their Section 7 right to disassociate.

The Supreme Court and NLRB have held unions may not limit when employees may resign membership, *Pattern Makers' League of N. Am. v. NLRB*, 473 U.S. 95, 104-05 (1985), or proscribe the form that resignation takes. *Sheet Metal Workers Local 170*, 225 NLRB 1178, 1180 (1976) (union cannot prohibit oral resignations that are clear and unequivocal expressions of intent to resign). Similarly, the Board has found certified mail requirements a violation of a union's duty of fair representation. *Cal. Saw & Knife Works*, 320 NLRB 224, 236-37 (1995).

As the Supreme Court recognized, the bar for an unduly burdensome requirement is low: "[w]hen one considers the problem in its industrial setting and recalls the fact that individual workmen are not as equipped for and inclined to correspondence as are business offices, any complication of the procedure necessary to withdraw or the addition of any extra steps to it may be burdensome." *Felter*, 359 U.S. at 336. Complications, misdirection, or unnecessary extra steps

are impermissibly burdensome because, as here, if employees fail to properly revoke their checkoff authorizations during the union's fifteen-day window period, they are forced to pay dues against their will for another full calendar year. This is the Union's intended consequence that naturally follows from a small window period layered on top of an unwritten process. *See Radio Officers Union v. NLRB*, 347 U.S. 17, 52 (1954) (union can foresee the consequence of its actions encouraging union membership); *Felter*, 359 U.S. at 336 ("Additional paper work or correspondence, after he once has indicated his desire to revoke in writing, might well be some deterrent, so Congress might think, to the exercise of free choice by the individual worker."); *see also Elec. Workers Local 66 (Houston Lighting & Power Co.)*, 262 NLRB 483, 486 (1982) (footnote omitted) (holding "a member may resign from the union at will so long as the desire to resign is clearly communicated," and "such communication may be made in any feasible way and no particular form or method is required"); *Pattern Makers'*, 473 U.S. at 107 ("voluntary unionism" is the purpose of Section 7 of the NLRA).

Here, the Union imposes another device to create an impermissible burden. To revoke, employees essentially must complete the revocation process twice. First, employees must send a revocation letter asking the Union to disclose their annual fifteen-day revocation window period. After receiving a response from the Union, within a timeframe exclusively controlled by the Union, employees must

15

send a second letter precisely during their Union-defined fifteen-day window period. Employees must send two letters because the Union refuses to disclose employee window period dates over the telephone, and it also misdirects them to their employer—which appears not to possess the information necessary to revoke. The Union proffered no reasonable justification for its policy of refusing to disclose window period dates over the telephone. Indeed, it maintains that policy for its own pecuniary interest in collecting dues from as many employees as possible.[6]

The requirement here to send two letters is far more burdensome than the special revocation forms struck down in *Felter* and *Peninsula Shipbuilders*, because the employees here must complete the process of revocation *twice* if they are not lucky enough to send their first letter during the Union's imposed window period. As neither the Union nor the Board, based on this record, could identify a legitimate basis to deny employees any information over the telephone necessary to comply with the Union's unwritten policy, this conduct violated the duty of fair representation.

---

[6] The Union's justifications were on their face so absurd, even the Board could not state a single justification for its decision.

### B.  The Union's duty of fair representation.

NLRA Section 9(a), 29 U.S.C § 159(a), establishes the labor organization chosen by a majority of the employees as the exclusive representative of *every* employee in the bargaining unit, to include those who did not choose it. Therefore, exclusive representatives have a duty to fairly represent every employee, regardless of union membership status, and serve the interest of all unit employees without hostility or discrimination. *Vaca v. Sipes*, 386 U.S. 171, 177 (1967).[7]

 A union breaches its duty of fair representation if its conduct is: (1) arbitrary; or (2) discriminatory; or (3) in bad faith. *Int'l Bhd. of Teamsters, Local No. 310 v. NLRB*, 587 F.2d 1176, 1181 (D.C. Cir. 1978); *see also Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998); *Abrams v. Commc'ns Workers of Am.*, 59 F.3d 1373, 1377 (D.C. Cir. 1995). In other words, unions may not engage in conduct based on considerations that are "irrelevant, invidious, or unfair." *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 74 (1989) (citations omitted). This duty is the "bulwark to prevent arbitrary

---

[7] The federal courts, not the Board, created and exercise primary jurisdiction over the duty of fair representation. *See Steele v. Louisville & Nashville R.R., Co.*, 323 U.S. 192 (1944). Only belatedly did the Board deign to interpret a breach of the duty of fair representation as an equivalent ULP. *Vaca*, 386 U.S. at 177-79. Federal courts thus remain the prime expositor of the duty of fair representation, and the Board has no claim to exclusivity or special expertise in that area. This Court, however, has still given deference to Board decisions interpreting the duty of fair representation, but given the Board's absence of any reasoning in this case, the decision under review deserves no deference. *See DHL Express*, 813 F.3d at 371.

union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law," *id.* at 87 (quoting *Vaca*, 386 U.S. at 182), and has been analogized to the fiduciary duty of a trustee. *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 569 (1990). This trustee-like status is the foundation of exclusive representation under NLRA Section 9(a), because, without a concomitant duty to treat each member of the bargaining unit fairly, a union could wield its exclusive bargaining power to harm those who disagree with it. *See Steele v. Louisville & Nashville R.R., Co.*, 323 U.S. 192 (1944).

"The requirement of fair dealing between a union and its members is in a sense fiduciary in nature . . . ." *Int'l Union of Elec., Radio & Mach. Workers, Local 801 v. NLRB*, 307 F.2d 679, 683 (D.C. Cir. 1962). A union's fiduciary duty requires it to "inform [employees] of their obligations so that they may take whatever steps are necessary to protect their interests in their job." *NLRB v. Local 282 Int'l Bhd. of Teamsters*, 740 F.2d 141, 147 (2d Cir. 1984) (citations omitted). The union is "subject to a duty to use reasonable efforts to give [its] principal information which is relevant to affairs entrusted to [it] and which, as the agent has notice, the principal would desire to have." *Int'l Union of Elec., Radio & Mach. Workers*, 307 F.2d at 683 (citation omitted). A union's duty of fair representation includes the obligation to provide employees with requested information pertaining to matters affecting their employment. *See Branch 529, Nat'l Ass'n of Letter*

18

*Carriers*, 319 NLRB 879, 881 (1995) (union breached its duty of fair representation by refusing to provide employee copies of her grievance forms). A union may only deny an employee's request for information if it is "so [related] to legitimate union interests" that it is not arbitrary. *Local 282, Teamsters*, 740 F.2d at 147 (quoting *Robesky v. Qantas Empire Airways, Ltd.*, 573 F.2d 1082, 1089-90 (9th Cir. 1978)).

**C.     The Union's refusal to provide represented employees with anniversary or window period dates over the telephone was arbitrary.**

The Union's refusal to provide represented employees with their own time-sensitive anniversary dates over the telephone was arbitrary. *See generally Plumbers & Pipefitters Local Union No. 32 v. NLRB*, 50 F.3d 29, 32-33 (D.C. Cir. 1995) (applying the arbitrary standard to cases arising under the NLRA). Refusing to provide time-sensitive information over the telephone to an employee seeking to exercise his or her right to refrain is far outside the range of fair dealing, given the legal landscape and factual circumstances of this case. That is especially true given the Union's fiduciary obligations to Ruisi, Peluso, and others, which are at war with the Union's pecuniary interest in continuing to strap fee-paying employees to its mast.

The Board has held a union breaches its duty of representation, in violation of the NLRA, if it fails to provide employees with a wide range of requested

information, including information necessary to revoke checkoffs. *See Auto Workers Local 909 (Gen. Motors Corp.-Powertrain)*, 325 NLRB 859, 859 (1998) (union failed to provide an accounting to its members for the disparity in grievance settlement money distribution); *Local 282, Int'l Bhd. of Teamsters (Gen. Contractors)*, 280 NLRB 733 (1986) (union failed to provide job referral information in the operation of an exclusive hiring hall); *Sec. Pers. of Hosps. (Church Charity Found. of Long Island, Inc.)*, 267 NLRB 974, 980 (1983) (union failed to provide status of grievance); *Law Enf't & Sec. Officers, Local 40B (S. Jersey Detective Agency)*, 260 NLRB 419, 420 (1982) (union failed to provide copies of collective bargaining agreement and health and welfare plan); *Branch 529, Nat'l Ass'n of Letter Carriers*, 319 NLRB at 880-81 (union failed to provide copies of a grievance); *Int'l Bhd. of Boilermakers, Local Union No. 154*, 253 NLRB 747, 763 (1980) (union may not ignore request for information).

For example, in *Hughes Aircraft Co.*, 164 NLRB 76 (1976), an employee orally requested his revocation dates from both his employer and union steward. *Id.* at 77-78. Both the employer and union gave the employee incorrect information. The Board held the union's failure to properly respond with correct information was a violation of the Act. *Id.* at 79. This makes sense, as a union has a duty to divulge information it has easy access to—it does not serve any legitimate union interest to conceal requested information or make an employee jump through

20

time-consuming hoops and burdens if it has ready access to the information. *See Operating Eng'rs (Mich. Chapter, Assoc'd Gen. Contractors of Am., Inc.)*, 226 NLRB 587, 588, 596 (1976) (failure to respond to oral request for information about hiring hall violated duty of fair representation); *Cal. Saw,* 320 NLRB at 292 (Board adopting ALJ order that found certified mail requirement to resign union membership unlawfully required employees to "jump through hoops"). This is the Twenty-First century, where computers and laptops are ubiquitous; the record shows Union official Henry could produce the requested anniversary date information in moments, with a few keystrokes, as Peluso's checkoff was scanned into her computer system. JA 50, 174-75.

Despite this, the Board's decision here never ties the Union's burdensome, unwritten policy to *any union interest*. Nor can the Union's asserted interest in "privacy" save its restrictive unwritten policy. JA 47. There is nothing "private" about an anniversary date or a fifteen-day window period, and there is no evidence such dates could be misused.[8] Henry stated during the trial that she freely gives out the dates individuals become members of the Union, but not the anniversary date

---

[8] Nor can the Union or NLRB rely on the claim the Union needs to have a written letter to ensure it is communicating the correct window period information. Henry had immediate access to all the necessary information to correctly convey at least Peluso's window period date. She testified the physical copy of the checkoff was scanned into her computer system. JA 174. Nevertheless, even with a written letter, the Union still conveyed the wrong information and illegally denied Peluso's timely resignation.

of when they signed checkoff agreements. JA 47. Henry provided Peluso's anniversary date to Ruisi during their conversation on February 25, proving that the alleged claim of "privacy" or confidentiality in a date is a sham.

Moreover, the Board has long held this type of information is not protected, and unions have no interest in making it confidential.[9] In fact, the Board has recently brushed aside all notions of employee privacy regarding its election rules, holding that addresses, phone numbers, work schedules and personal e-mail addresses must all be disclosed to union organizers, with no employee right to opt out. Representation – Case Procedures, 79 Fed. Reg. 74308, 74335-61 (Dec. 15, 2014). Of course, here the Board does not even reference the Union's justifications in its decision.

---

[9] Even employees' personal information—home addresses and telephone numbers—are not considered confidential under Board law. *See Int'l Alliance of Theatrical Stage Emps. (Tropicana Las Vegas, Inc.)*, 363 NLRB No. 148, at *14 (2016) (union must give its hiring hall list to employee even if it contains phone numbers and addresses of union members); *Operating Eng'rs*, 226 NLRB at 587 (same); *Excelsior Underwear Inc.*, 156 NLRB 1236, 1244 (1966) (Board will not presume harassment will follow release of employees' names and home address). Indeed, the Board holds that strikebreakers and picket line crossers have no privacy interest in their names and addresses, even when faced with union violence. *Chicago Tribune Co. v. NLRB*, 965 F.2d 244 (7th Cir. 1992), *denying enforcement of* 303 NLRB 682 (1991); *Chicago Tribune Co.* v. *NLRB*, 79 F.3d 604 (7th Cir. 1996), *denying enforcement of* 316 NLRB 996 (1995); *see also Am. Baptist Homes*, 364 NLRB No. 13, n.2 (2016) ("[T]he names and addresses of permanent replacements constitute presumptively relevant information.").

The Union's policy is arbitrary because it was misunderstood and unequally applied by the Union. The Union claims the policy is meant to protect against accidently ceasing to collect a willing member's dues.[10] JA 47. Simply providing an anniversary date to an employee who inquired over the telephone could not stop any dues deductions. JA 47. Henry's answer betrays a stunning misunderstanding of what Ruisi and Peluso were seeking to accomplish when they asked for their respective window period dates. They were not attempting to stop their dues deductions when they placed those telephone calls. Rather, they were merely seeking *information* about their respective fifteen-day window periods, so they could thereafter submit timely written revocations if they chose to do so. Henry's testimony shows she did not understand the difference between an employee revoking his or her checkoff and an employee merely seeking his or her window period date, the latter of which does not immediately affect any employee or member's dues payor status. Henry eventually provided *Peluso's* window period over the telephone to Ruisi, in contradiction of her own policy and the primary rationale behind it. JA 92. Interestingly, Henry only did so after she believed Peluso had missed his window period by one day.

---

[10] Again, it is odd that a Union places so much emphasis on the need for written requests based on an unwritten "policy." It demonstrates the Union's position was not one of fair dealing, but merely meant to frustrate employees in their attempt to leave the Union.

Here, the Board did not set forth a single valid justification for the Union's refusal to provide the readily accessible and time-sensitive date information over the telephone. Consequently, the Union's conduct violates the duty of fair representation. *See Marquez*, 525 U.S. at 46 ("A union's conduct can be classified as arbitrary . . . when it is without a rational basis or explanation.").

### D.  The Union's refusal to provide time-sensitive information was in bad faith.

The Union's failure to divulge the window period dates was in bad faith. "A bad-faith violation of the duty of fair representation 'requires a showing of fraud, or deceitful or dishonest action.'" *Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers v. NLRB*, 41 F.3d 1532, 1537 (D.C. Cir. 1994) (quoting *Mock v. T.G. & Y. Stores Co.,* 971 F.2d 522, 531 (10th Cir. 1992)). To constitute bad faith "a union's actions toward unit employees [must] be 'sufficiently egregious or so intentionally misleading as to be invidious'" *Id.* (citation omitted).

Henry's purposeful misunderstanding of the procedure for revoking a checkoff, her misapplication of the policy to a mere request for readily accessible window period dates, and intentionally sending Petitioners to a source—the employer's payroll department—that did not possess the dates, are more than "sufficiently egregious," particularly given her role of regularly processing such requests as the Union's Director of Operations.

24

In essence, the Union places obstacles in the path of unsuspecting members to force them into paying dues for another year. *See e.g.*, *Shea v. Int'l Ass'n of Machinists & Aerospace Workers*, 154 F.3d 508, 515 (5th Cir. 1998) ("The IAM has not proffered any legitimate reason why an annual written objection requirement is necessary. . . . It seems to us that the unduly cumbersome annual objection requirement is designed to prevent employees from exercising their constitutionally-based right of objection, and serves only to further the illegitimate interest of the IAM in collecting full dues from nonmembers who would not willingly pay . . . ."); *Peninsula Shipbuilders*, 663 F.2d at 489 (union denied employees revocation based on failure to use union forms and other procedures imposed unilaterally by the union); *Felter*, 359 U.S. 327 (same). And as Peluso's experience shows, the Union is all too happy to play games in its attempt to deny even valid checkoff revocations. Here, the Union denied Peluso's written revocation by falsely claiming it was one day late. JA 407 (ALJ finding the Union wrongfully denied Peluso's revocation because it miscounted its own fifteen-day window period).

**E.  The Union's refusal to provide the requested information was discriminatory.**

A union's discriminatory conduct violates the duty of fair representation when it is "intentional, severe, and unrelated to legitimate union objectives."

*Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 301 (1971).

Here, the Union refused to respond over the telephone to simple employee inquiries about their anniversary dates and checkoff obligations. Burdensome policies, creating traps for the unwary, "serve no legitimate purpose; they only make it difficult for a member to exercise the right to withdraw from the union." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. NLRB*, 865 F.2d 791, 797 (6th Cir. 1989).

This Union's unwritten "policy" is yet another attempt to complicate checkoff revocations, for no reason other than to continue to collect money from an employee against his wishes. Henry admitted she freely gives union members their union initiation dates over the telephone. Her rationale for disclosing such initiation dates to members over the telephone is those dates "had no bearing" on the member's status and did not constitute personal information. JA 46. The Union intentionally discriminates, however, when employees ask for dates that allow them to *disassociate from the Union*. The incoherence and disparate action towards members seeking their union initiation date and other employees seeking their anniversary or window period dates proves the Union's discriminatory intent.

Ultimately, *all* requests for window period date information are against the Union's pecuniary interests, because it does not want to lose the dues payments of

represented employees. The Union benefits when employees fail in their efforts to cease paying dues and miss their window periods. The Union's policy of forcing employees to send two letters, essentially requiring employees to revoke twice, is arbitrary, in bad faith, and intentionally discriminates against employees who seek to revoke their checkoffs, all with the illicit objective of increasing union coffers at the expense of those it has a duty to protect.

## II.   THE BOARD'S DECISION CONTAINS NO REASONING AND LACKS CITATION TO ANY RELEVANT AUTHORITY.

A proper analysis of the duty of fair representation requires the Board and reviewing courts to analyze with particularity a union's actions to determine whether the union violated any of the three prongs of the duty of fair representation. The Board must balance the "tension between individual, collective, and public policy interests." *Cal. Saw*, 320 NLRB at 230; *see also Breininger*, 493 U.S. at 77 ("Most fair representation cases require great sensitivity to the tradeoffs between the interests of the bargaining unit as a whole and the rights of individuals."); *Machinists Local Lodge 2777 (L-3 Commc'ns)*, 355 NLRB 1062, 1062 (2010) ("In applying the arbitrary standard here, we accordingly consider the balance between the competing interests: the legitimacy of the union's asserted justifications for its procedures and the extent to which they burden employees' [rights] . . . ."). But here, the Board's opinion is scant on reasoning and perfunctory in its conclusions. The Board's decision is a blank slate. The Board

27

does not weigh the interests, and ignores critical facts as well as the employees' need for *timely* information to protect their Section 7 rights.

The Board adopted an ALJ's opinion devoid of any reasoning, application of the facts to current law, or citation of relevant authority. The Board adopted the opinion in a footnote saying: "Other Board precedent also supports the judge's conclusion," before citing two inapposite cases: *Postal Service*, 302 NLRB 701, 702 (1991); and *Boston Gas Co.*, 130 NLRB 1230, 1231 (1961).[11] JA 403.

The Board offers no support for its legal conclusion that the Union may refuse to respond to requests for time-sensitive, non-confidential information over the telephone. Its *ipse dixit* reasoning is enough to overturn the decision and order judgment for the Petitioners. *DHL Express*, 813 F.3d at 371 (NLRB must offer adequate explanation of its decision); *Long Island Head Start Child Dev. Servs. v. NLRB*, 460 F.3d 254, 260 (2d Cir. 2006) (reversing NLRB order for failure to cite any relevant case law or other reasons for its decision); *Manorcare of Kingston*, ___ F.3d ___, No. 14-1166, at *12-13; *see supra* p. 12.

---

[11] These cases are irrelevant, see *infra* 29-31. The Board also makes a passing reference to *Mail Handlers Local 307 (Postal Service)*, 339 NLRB 93 (2003). But that case is irrelevant as well. That case dealt with an employee who was denied information because he had no legitimate interest in obtaining a copy of witness statements because he had already agreed to a binding settlement of his grievance. *Id.* at 94.

The Board's decision fails to consider pertinent, uncontested facts that must be evaluated in this case. For example, the Board fails to mention that the Union is in ready possession of employees' anniversary dates, and could have looked up and communicated Ruisi and Peluso's dates in "less than a minute or two." JA 53-54. Similarly, the Board ignores the time-sensitive and critical nature of such employee requests, as demonstrated by the fact Peluso serendipitously filed his revocation letter with *zero* days to spare (and even then the Union rejected it). JA 408. The Board also fails to weigh the Union's obvious pecuniary interest in hiding the ball and hoping that employees miss their window period, thus having to pay dues for another year.

The Board also fails to evaluate the Union's purported justification for refusing to give dates over the telephone—a theoretical "privacy" interest. Henry admitted, however, there was nothing "private" about a mere date. JA 47. While the Union self-righteously claims it cannot give out anniversary or window period dates over the telephone, its agent provided Peluso's anniversary date to Ruisi over the telephone. JA 92. The Board considered none of these factual circumstances and contextual considerations.

Further bootstrapping to reach its desired result, the Board's opinion cites two inapposite cases, *Postal Service* and *Boston Gas Co.* The Board claims *Postal Service* "considered the question of whether a union violated the Act when it

responded to an employee's request for his anniversary date by informing him the standard procedure to obtain those dates." JA 403. *Postal Service*, however, dealt with a union *that did not possess the anniversary dates of employees seeking to stop dues deductions*. 302 NLRB at 711 (ALJ noting "the Union argues that neither the [National Union] nor [the Local Union] had the resignees' anniversary dates in their possession nor did they have control over this information"). In fact, the U.S. Postal Service, not the union, maintained the relevant anniversary dates at its Postal Data Center. *Id.* at 701. In that case, a number of employees questioned where they could find their anniversary dates. The Union told employees they could call the Postal Data Center, which maintained the necessary dates. *Id.* at 702. A union cannot have a duty to provide information it does not possess.

Here, however, the Union knew the critical dates, and Ruisi and Peluso properly contacted the Union representative in charge of handling such requests. That Union agent testified she could look up the dates within two minutes by using an employee's social security number as verification, but instead refused. JA 53-54. The NLRB's citation of *Postal Service* actually supports Ruisi and Peluso's claims that the Union violated its duty of fair representation by refusing to adequately respond to their requests, where it had the information readily available. Unlike the union in *Postal Service*, this Union maintained and had in its possession

the window period information, but unjustifiably refused to provide it unless and until employees jumped through the hoop of sending a formal letter.

*Boston Gas* is similarly distinguishable and irrelevant. There, the Board upheld a contract clause requiring employees to give written notice of a dues deduction revocation to both the employer and union. 130 NLRB at 1231. The Board found the requirement that revocations be in writing was not unduly burdensome. *Id.* Ruisi and Peluso's case does *not* challenge the Union's policy requiring *revocations* to be in writing. To the contrary, this case deals with an unwritten policy denying employees access to time-sensitive, readily available date information. Since a request for the date of checkoff anniversary is a necessary prerequisite for exercising Section 7 rights and complying with the Union-imposed fifteen-day window period to revoke, *Boston Gas* has no bearing here. *See also Felter*, 359 U.S. at 336 ("The complete freedom of individual choice in this area, undampened by the necessity of such *preliminary dealings with the labor organization to make it effective*, may seem unfortunate to labor organizations, but it is a problem with which we think Congress intended them to live." (emphasis added)). Given the Union will not disclose window period dates over the telephone, realistically, unless an employee is lucky enough to hit a randomly decided fifteen-day window period with his or her first letter, an employee will likely have to send two letters to revoke.

31

The Second Circuit's decision in *Long Island Head Start*, 460 F.3d 254, is instructive. There, the Board ruled that certain health benefits were unlawfully changed once the parties began negotiations towards a new agreement. *Id.* at 257. The Board cited only three cases in support of its proposition and offered no "independent policy justification or legal analysis in support" of its position. *Id.* at 258. Because all three cases cited by the Board were inapposite, the Second Circuit found the Board "failed to present either a well-reasoned explanation for its rule or an analysis of all the relevant issues." *Id.* at 260. Here too, the two cases the Board cites do not support the proposition that a union *possessing easily accessible* information may burden employees by requiring them, pursuant to an unwritten policy, to request window period dates in writing. The Board's decision lacks any analytical foundation and must be overturned.

## CONCLUSION

The Board's decision is unsupported and the Union's unwritten, informal policy has no valid justification. The Union's policy is arbitrary, discriminatory, and in bad faith. Moreover, the Board erroneously applied established law to the facts at issue, and ignored other critical facts. The Board's decision must be reversed and the Petition granted.

By: /s/ Aaron B. Solem
Aaron B. Solem
Glenn M. Taubman
Alyssa K. Hazelwood
c/o National Right to Work Legal
  Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
(703) 321-8510
abs@nrtw.org
gmt@nrtw.org
akh@nrtw.org

Date: June 16, 2016                     *Attorneys for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I further certify that the foregoing document was served on all parties or their counsel of record through the appellate CM/ECF system as they are registered users.


Date: June 16, 2016                         By: /s/ Aaron B. Solem
                                            Aaron B. Solem
                                            c/o National Right to Work Legal
                                              Defense Foundation, Inc.
                                            8001 Braddock Road, Suite 600
                                            Springfield, Virginia 22160
                                            703-321-8510
                                            abs@nrtw.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief contains 7,755 words in accordance with the word count typed in 14 point typeface and is in compliance with the type-volume limitations of FRAP 32(a)(7)(B) and (C) and this Court's briefing order.

Date: June 16, 2016

By: /s/ Aaron B. Solem
Aaron B. Solem
c/o National Right to Work Legal
  Defense Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, Virginia 22160
703-321-8510
abs@nrtw.org

# STATUTORY ADDENDUM

## Section 7 of the NLRA, 29 U.S.C. § 157

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

* * *